No. 18,792.

A. E. HESS (C. F. HARDER and S. C. HOLMES, *Appellants*), v. E. S. CONWAY et al., *Appellees*.

OPINION DENYING A REHEARING.

SYLLABUS BY THE COURT.

1. SUPREME COURT—*Distinction Between Original and Appellate Jurisdiction.* The case of *In re Burnette*, 73 Kan. 609, 85 Pac. 575, so far as it points out the distinction between original and appellate jurisdiction and the lack of power on the part of the legislature to confer original jurisdiction on this court, followed.

2. SAME—*Section 580 of Civil Code, Relating to Further Testimony in Supreme Court, Construed.* Section 580 of the civil code, providing that in all cases except those triable by jury as a matter of right, this court may, on appeal, receive further testimony and adopt such procedure as may be necessary or expedient for a full and final hearing and determination of the cause, would be unconstitutional if construed to authorize a prolongation or renewal of the trial of issues of fact in this court on appeal.

3. SAME. To save the section from unconstitutionality it must be interpreted merely as providing this court with adequate means for exercising its true appellate jurisdiction. The nature of the court's function is not changed and the scope of its original jurisdiction is not enlarged, but the exercise of its appellate jurisdiction is facilitated by giving it command of aids to review supplemental to the strict record of the cause and sufficient to meet the exigencies of any case.

4. SAME—*When Further Testimony May Be Considered by Supreme Court.* Without the aid of a statute this court may, in the exercise of its appellate jurisdiction, avail itself of authentic evidence outside the record to prevent a miscarriage of justice, to avoid a useless circuity of proceeding, to protect its jurisdiction, to protect itself against imposition where the controversy has been settled or for other reason no longer in fact exists, and perhaps under other peculiar and extraordinary circumstances.

5. SAME—*Further Testimony Not Considered Under the Facts of This Case.* In this case a trial of the issues of fact occurred in the district court in August, 1912. A rehearing was granted, and another trial occurred in February, 1913, when the parties extended their evidence to their own satisfaction. Evidence which was available then and which merely supplements the proof offered in the district court is now tendered to this court. *Held,* the court is not authorized by section 580 of the civil code to receive and consider the evidence, and no occasion exists for departing from the rule that after the district court, which is created and equipped for that purpose, has made a final determination of the issues of fact in a cause, original investigation of such issues is closed.

6. PRACTICE—*Disciplining Attorneys—Form of Procedure Not Material.* The form of procedure which results in an exercise of the disciplinary power of a court over one of its attorneys is not material to the validity of the order, so long as the essentials of fair notice and opportunity to be heard are observed, and in this case it is held that every requirement of due process of law was satisfied.

7. —— *Rehearing Denied.* Upon reconsideration of the entire cause the original decision is adhered to.

Appeal from Woodson district court; OSCAR FOUST, judge. Opinion denying a rehearing filed November 14, 1914. (For original opinion of affirmance see 92 Kan. 787, 142 Pac. 253.)

*C. W. Shinn,* of Neodesha, *S. C. Holmes,* of Yates Center, *Leonard S. Ferry, Thomas F. Doran,* and *John S. Dean,* all of Topeka, for the appellants.

*G. H. Lamb,* and *W. E. Hogueland,* both of Yates Center, for the appellees.

The opinion of the court was delivered by

BURCH, J.: Petitions for a rehearing have been filed by Harder and by Holmes. In both petitions complaint is made of the refusal of this court to disturb the findings of the district court upon the facts. Not only is the evidence offered in the district court reargued, but a mass of new evidence is presented here for the first time in an effort to show that the conclusions of the district court concerning the facts should be disapproved. As might be expected if such a practice were tolerated, the witnesses for the appellants carefully filled up the gaps and strengthened the weak places in the case made by their former testimony. Presumably, this course is taken pursuant to section 580 of the civil code, which reads as follows:

"In all cases except those triable by a jury, as a matter of constitutional right, the supreme court may receive further testimony, allow amendments of pleadings or process, and adopt any procedure not inconsistent with this act which it may deem necessary or expedient for a full and final hearing and determination of the cause."

This court can not consider the new evidence. If it had a thought of doing so it would be obliged to grant the adverse party time to produce countervailing evidence, which might possibly include impeaching evidence. The appellants would then likely desire to make a showing in rebuttal. The result would be that the court would have before it for determination a case which the district court could not identify as one which it had decided, and so this court would be plunged into an exercise of original and not appellate jurisdiction.

In the case of *In re Burnette*, 73 Kan. 609, 85 Pac. 575, the distinction between original and appellate jurisdiction was pointed out, as well as the lack of power on the part of the legislature to confer original jurisdiction on this court. The constitution creates the court as it creates the legislature, and that instrument, which both the court and the legislature must respect and obey, expressly limited the court's original jurisdiction to proceedings in quo warranto, mandamus, and habeas corpus, and granted to the legislature no power to confer any but appellate jurisdiction. The exceptional and extraordinary character of the court's original jurisdiction becomes apparent when the nature of the proceedings specified in the constitution is considered. A few years before the constitution of Kansas was framed, the supreme court of Wisconsin, discussing this subject, said:

"This class of writs, it would seem, appertain to and are peculiarly the instruments of the sovereign power, acting through its appropriate department; prerogatives of sovereignty, represented in England by the king, and in this country by the people in their corporate character, or in other words, *the state;* and from their very nature, from their peculiar character, functions and objects, to appertain to and appropriately belong to the supreme judicial tribunal of the state. . . . These writs differ essentially in their character and objects, from ordinary writs issued by the courts in the regular and usual administration of the law between parties. They go to accomplish peculiar and specific objects, carrying with them the special mandate of the sovereign power, addressed to the person, corporation or officer requiring them to do or not to do, to proceed, or to desist, to perform the duty required by law, or to abstain from the exercise of powers without lawful authority, etc. They bear no resemblance to the usual processes of courts, by which controversies between private parties are settled by the judicial tribunals of every grade." (*The Attorney General v. Blossom and others*, 1 Wis. 277, 279.)

A few years after the constitution of Kansas was adopted, the supreme court of Missouri, discussing the same subject, said:

"It is very plain that were it not for the express exceptions contained in the constitution, this court could exercise no original jurisdiction. . . . This court was designed to be strictly appellate in its character, duties and functions, with certain marked and definite exceptions. The framers of the constitution doubtless saw that contingencies might arise when it would not only be fit but indispensably necessary that this court should interpose its process in the first instance. There may be occasions when not only the interests of the citizen, but the safety and welfare of the state, may depend upon the issuance from this tribunal of its original remedial process; and for such exigencies provision was made. *Habeas corpus, mandamus, quo warranto, prohibition,* etc., are high prerogative writs, emanating from this court by direct application and by the authority of the sovereign power of the state. They are only issued when applied for in a proper case, and are wholly variant from that process of summons or notice by which one party brings an adverse party into court to determine a private right or to settle a matter of ordinary litigation." (*Vail, Contestor, v. Dinning, Contestee,* 44 Mo. 210, 214, 215.)

These quotations are sufficient to illustrate the political and legal theory of constitutions like that of Kansas. Indeed there can be no difference of opinion that the true intention was to create an appellate court having power to expound the law, supervise the conduct of inferior tribunals, and correct errors in their proceedings, but with no original jurisdiction except in the extraordinary matters referred to. Neither can there be any difference of opinion that the legislature is powerless to add to that original jurisdiction.

If the statute quoted were to be interpreted as giving this court power on appeal to determine equity cases and others not triable by jury as a matter of right, in the same way that the district court determines them, it would be unconstitutional. It must, therefore, be in-

terpreted merely as providing this court with adequate means for exercising its true appellate jurisdiction. The nature of the court's function is not changed and the scope of its original jurisdiction is not enlarged, but the exercise of its appellate jurisdiction is facilitated by giving it command of aids to review supplemental to the strict record of the cause and sufficient to meet the exigencies of any case. .

Sometimes the court is in need of extraneous evidence respecting some situation or fact to enable it to determine, not the propriety of the conduct of the district court, but the nature of the judgment to be directed. Sometimes a document, or public record, or other item of evidence of like character, material to a proper determination of the appeal and substantially incontestible, is called for, or is examined if produced, and then is treated in the same way as an admission of the parties would be treated if found in the record. These instances are illustrative, and no doubt many occasions will present themselves when it will be important for the court to avail itself of knowledge of some fact not established at the trial in order that it may make just disposition of an appeal.

In the case of *Caldwell v. Modern Woodmen*, 90 Kan. 175, 133 Pac. 843, Jane Caldwell recovered judgment on a beneficiary certificate issued by the Modern Woodmen of America insuring the life of her husband, W. H. Caldwell. The proof of death consisted in proof of absence for a sufficient length of time and under such circumstances as to raise a presumption of death. While this court still had possession of the case on appeal, the defendant in the action not only furnished evidence showing that Caldwell was still alive but produced the man himself. The court granted a new trial as to the single issue of death, with direction that if the issue were determined favorably to the defendant judgment should be rendered accordingly.

In the opinion it was said:

"This court can not determine, it is true, from the new evidence the question whether Caldwell is living. If that issue is to be retried it must be retried in the district court, but in the exercise of its appellate jurisdiction this court may, and in the very unusual situation presented should, in order to prevent a failure of justice, consider the new evidence, in determining whether a new trial of that issue should be granted. This evidence, uncontradicted as it is, shows that a mistake was made in a finding of a fact essential to support the judgment. In view of the evidence presented at the trial and the whole situation it can not be held that the defendant is precluded from proving the fact that Caldwell is living because of its failure to discover and produce the evidence at the trial. It may be conceded that when the end of orderly judicial processes is reached, an adjudication, although based upon mistake, is final. Still a miscarriage of justice will not be tolerated so long as the court by the use of such processes can apply a remedy." (p. 177.)

The court did not cite the statute quoted above as the foundation of its power to prevent a miscarriage of justice under the peculiar and extraordinary circumstances of the Caldwell case. In the case of *Ridge v. Manker*, 67 C. C. A. 596, 132 Fed. 599, it was said, citing a long list of authorities:

"An appellate court may avail itself of authentic evidence outside of the record before it of matters occurring since the decree of the trial court when such course is necessary to prevent a miscarriage of justice, to avoid a useless circuity of proceeding, to preserve a jurisdiction lawfully acquired, or to protect itself from imposition or further prosecution of litigation where the controversy between the parties has been settled, or for other reasons has ceased to exist." (p. 598.)

Whether the statute might have been invoked in the Caldwell case or not, it can not, consistently with constitutional validity, be construed to authorize a prolongation or renewal of the trial of issues of fact in this court on appeal. The district courts are established and are equipped for the purpose of investigating and

determining issues of fact, and parties must prepare their cases for trial there.  A method of obtaining a continuance is prescribed if a party can not secure his evidence in time for trial when his case is reached. When the trial occurs he may shape his evidence as he desires, but he is bound by his choice and can not in the event of defeat better his case by offering more proof or different proof in this court on appeal.   In case of accident, suprise, want of fair opportunity to produce evidence, or the discovery of new evidence, a new trial may be obtained upon seasonable application to the district court, but after the tribunal created for the purpose of making final determination of issues of fact has performed that function, original investigation of such issues is closed, and it is no ground for reversal that evidence exists which would have turned the scale in favor of the defeated party if it had been uncovered in the district court.

In this case Harder, by his attorney Holmes, brought on a trial of the isues of fact in August, 1912, and was defeated.   The court granted an application for a rehearing, and another full trial occurred in February, 1913, when the parties extended their evidence to their own satisfaction.   The appellants were then in communication with Hess and took his affidavit to be used as evidence at the second hearing.   Every other witness whose testimony is offered here was a witness at that hearing, all the evidence now tendered to this court was available then, the issues now are identical with what they were before, the appellants have twice had a day in court in which to produce their proof, and the controversy over the facts is ended.

It is said that since the case is presented here in substantially the same form it bore in the district court this court should make an independent estimation of the facts, giving due consideration to the action of the district court.  That course has been pursued as far as possible, but situations were encountered which the district court was better able to solve than this court.

The question of first importance in the case is how the insurance money was to be applied. Did Holmes and Hogueland agree that it should be applied to satisfy the excess judgment or to the redemption of the real estate? If the agreement were that the insurance money should be applied to redeem the real estate it is idle to contend that Holmes did not have the entire insurance money episode in mind when shortly afterwards he began to represent Harder's interest in the property. The law does not permit him to deny that he performed his duty to his client by divulging the information he possessed, and imputes the knowledge of the attorney to the client precisely as it imputes the knowledge of the agent, C. F. Harder, to his principal. Having knowledge of the facts and having kept silent until after the period of redemption had expired, Harder is estopped from claiming that the last payment, which he suffered Conway to make in the belief that it would effect redemption, did not accomplish redemption.

Holmes and Hogueland are not in accord with respect to the nature of their agreement. This court has before it merely their affidavits and the rest of the proof. The district court had before it the same affidavits and the rest of the proof, but the affidavits were those of two of its regular practitioners with whose conduct and habits of mind it was perfectly familiar. Certainly this court is not qualified to question the weight given the statements of the two attorneys by the district court. It may be noted here that earlier in the same cause Holmes filed, without taking thought, he says, an affidavit very wide of facts of which he had full personal knowledge.

In support of Harder's petition for a rehearing the rule is invoked that knowledge of an attorney will not be imputed to his client when the attorney acts fraudulently or is so interested in the transaction that he would naturally withhold the information. There is no

indication that Holmes diverted the redemption money for the purpose of personal gain to himself, and the court declines to express itself upon the matter of fraud further than it has already done. If redemption were not effected Hess would have his judgment paid in full and Harder would have the land. ˙ That situation did not necessarily preclude the attorney from speaking.

In the original opinion an ellipsis occurs which makes the court say that the certificate of the clerk, summarizing the appearances of Holmes for Harder shown by the dockets of the district court which were introduced in evidence, was itself read in evidence. The court understood the record, which was without ambiguity. In this connection it may be stated that the court regarded previous employments of Holmes by Harder as unimportant. Indeed the employment in June, 1911, might be left out of account since the judgment is supported by proof that F. H. Harder, the undisputed agent of C. F. Harder, was fully advised, before redemption was completed, of the fact that the insurance money had come into the hands of Holmes.

. Holmes still insists that the order upon him to restore to the clerk the redemption money which came into his possession was irregular for informality of procedure. The form of procedure in summary disciplinary proceedings is not controlling so long as the essentials of fair notice and opportunity to be heard are present. In this case Harder's right to a deed depended upon what his attorney's professional conduct had been. That was the primary issue tendered by the motion to require the sheriff to make a deed, and the attorney himself filed the motion and brought on the investigation. A trial was had in which all the facts were developed. Holmes and Hogueland gave their versions of the agreement with respect to the application of the insurance money. The money was traced, step by step, from the insurance company through Holmes to Hess. Holmes was necessarily compelled to describe

and to defend his conduct, and did so by his own testimony and by other evidence which he adduced. The result was that in legal effect he stood before the court as one of its officers who had diverted from its treasury funds arising from the litigation. Then the attorney asked for another hearing, which was granted. While on the face of the record he appeared as the attorney for Harder, the substance of the issue still was what the character of his professional conduct had been. The nature of the charge against him had been fully disclosed at the first trial. It appeared in detail and in writing in the affidavits filed in the case. It was that charge which he knew he must meet at the second trial, which he had secured. He had from August of one year to February of the next year in which to prepare. To say that he did not make due preparation would be to impute to him unfaithfulness to Harder. He had command of the case, took such testimony from his former client, Hess, as he desired, and presented such other evidence as he desired, including additional affidavits of his own. At the final trial he was given full opportunity to defend in his own way and to an extent satisfactory to himself. Consequently every requirement of due process of law has been satisfied, and the court was not called upon to go through the ceremonious performance of instituting and prosecuting another proceeding, for the sake of stating the charges, giving notice, and having a hearing, before entering the disciplinary order.

All the matters presented by the petitions for a rehearing have been duly considered by the court and both petitions are denied.